**POTTER HANDY LLP**
Mark D. Potter (SBN 166317)
James M. Treglio (SBN 228077)
Isabel Rose Masanque (SBN 292676)
classactions@potterhandy.com
100 Pine St., Ste 1250
San Francisco, CA 94111
(415) 534-1911
Fax: (888) 422-5191

Attorneys for Plaintiff, on behalf of himself and all others similarly situated

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SPENCER KAIDI, on behalf of himself and all others similarly situated

Plaintiffs,

v.

T-MOBILE USA, INC., a Delaware Corporation; and DOES 1-100, inclusive

Defendants.

CASE NO. 3:26-cv-04412-TLT

**FIRST AMENDED CLASS COMPLAINT FOR VIOLATIONS OF:**

**(1) PENAL CODE § 630 ET SEQ. (CALIFORNIA INVASION OF PRIVACY ACT);**
**(2) WIRETAP ACT, 18 U.S.C. § 2510 *et seq*.**
**(3) CALIFORNIA PENAL CODE § 502 (CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT);**
**(4) ART. 1, § 1, CALIFORNIA CONSTITUTION (INVASION OF PRIVACY); and**
**(5) CAL. BUS. & PROF. CODE §17200, ET SEQ. (CALIFORNIA UNFAIR COMPETITION LAW)**

**DEMAND FOR JURY TRIAL**

Class Representative Plaintiff Spencer Kaidi ("Plaintiff"), by and through his attorneys, individually and on behalf of others similarly situated, allege upon information and belief as follows:

## NATURE OF THE ACTION

1. Defendant T-Mobile USA, Inc. a Delaware Corporation ("Defendant") owns and operates a website https://www.metrobyt-mobile.com (the "Website" or "Metro by T-Mobile").

2. Defendant uses the Website to market, advertise, sell, and provide information about prepaid wireless plans, mobile phones, mobile devices, internet devices, promotions, store locations, and related services.

3. When users visit the Website, Defendant causes the visitor's browser to download and execute computer code selected, embedded, and configured by Defendant. That code includes cookies, pixels, tags, tag managers, local-storage objects, session-storage objects, software development kits, analytics scripts, advertising scripts, browser-fingerprinting scripts, and other tracking processes (collectively, the "Trackers").

4. The Trackers do not merely allow Defendant's server to receive an ordinary webpage request. The Trackers cause a visitor's browser to initiate additional communications to third-party domains and to transmit copies of the visitor's Website communications and associated data to third parties in real time.

5. The data transmitted through the Trackers includes, depending on the Website page and user interaction, page URLs, page titles, referrer URLs, timestamps, IP addresses, user-agent strings, browser type, device type, operating-system information, screen and rendering characteristics, unique cookie identifiers, advertising identifiers, session identifiers, visitor identifiers, page-view events, click events, scroll events, product views, plan views, location-related data, search queries, and information typed into online forms.

6. The substance and meaning of these communications include what the visitor is trying to view, compare, purchase, locate, or communicate to Defendant on the Website, including the visitor's interest in particular phone plans, devices, promotions, store locations, and related services.

7. The third parties that receive these communications include separate companies that operate advertising, analytics, audience-management, conversion-measurement, retargeting, identity-resolution, session-replay, consent-management, and fraud-detection systems. These third parties set and read their own identifiers, receive data on their own domains, and use Website visitor data for purposes that include cross-site identification, audience creation, ad attribution, analytics, retargeting, fraud scoring, and behavioral profiling.

8. Defendant uses the Trackers to monetize, analyze, personalize, optimize, and advertise through the Website, including by measuring advertising campaigns, creating and refining audiences, retargeting visitors, determining purchase intent, personalizing offers, and sharing Website communications and identifiers with third-party advertising and analytics ecosystems.

9. The Trackers operate invisibly in the background. A reasonable Website visitor cannot see, from the visible page alone, that Defendant is causing the visitor's browser to transmit Website communications and device/browser identifiers to separate third-party domains.

10. Because the Trackers intercept information about the Website visitors' interactions with the Website, the Trackers constitute unlawful wiretapping under Section 2511 of the Electronic Communications Privacy Act ("ECPA") and Section 631 of the California Invasion of Privacy Act ("CIPA").

11. Because the Trackers also capture Website visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of CIPA. See *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023). By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a).

12. Plaintiff brings this action to prevent Defendant from intercepting, disclosing, using, and causing third parties to intercept, disclose, and use Plaintiff's and Class Members' Website communications and identifying data without lawful consent, and to recover statutory, actual, and equitable relief for Defendant's violation of the ECPA and CIPA.

## PARTIES

13. Plaintiff Spencer Kaidi resides in Napa, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff was in California when he visited the Website.

14. Defendant T-Mobile USA, Inc. is a Delaware Corporation, with its principal place of business located in Bellevue, Washington.

## VENUE AND JURISDICTION

15. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts a claim under the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as Plaintiff's federal claim. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this is a putative class action in which the proposed class contains more than 100 members, at least one class member is a citizen of a state different from Defendant, and the amount in controversy exceeds $5,000,000 in the aggregate. Venue is proper because Plaintiff accessed the Website from California, Defendant obtained Plaintiff's communications and data from California, and Defendant directed the challenged conduct toward California consumers.

## I. INTRODUCTION

### A. The California Invasion of Privacy Act

1. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

2. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); see also *Greenley, supra*, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*,

2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

3. Individuals may bring an action against the violator of any provision of CIPA—including CIPA sections 630 and 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B. The Federal Wiretap Act**

4. The ECPA was originally enacted in October 1986 to extend privacy protections to emerging technologies. In drafting the legislation, Congress acknowledged that "[t]he dramatic development of the Internet has transformed methods of gathering, processing and sharing information." Senate Judiciary Committee Report (S. Rep. No. 99-541, 1986). Therefore, the statute aimed to address "individuals' concerns that a sufficient degree of privacy and the integrity of personal information are maintained in an age of modern communications and information storage." *Id.*

5. Although limiting overreach by law enforcement was one of the main purposes of the statute, the ECPA explicitly applies to private actors, including "any individual, partnership, association, joint stock company, trust, or corporation" who illegally intercepts, or attempts to intercept, "the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C.A. § 2510(4)(6).

6. The statute authorizes individuals to recover civil damages of up to $10,000 from any person who violates the provisions of the ECPA.

## II. DEFENDANT ILLEGALLY INTERCEPTS THE CONTENTS OF ELECTRONIC AND WIRE COMMUNICATIONS AND ILLEGALLY CAPTURES IDENTIFYING INFORMATION

**A. Overview of Website Tracking Technology**

7. Website tracking technology originally consisted of simple tools such as first-party cookies accessible only by the domain (website address) that set the cookies. However, as online

advertising and analytics advanced, the industry increasingly relied on third party cookies which are set and accessed by domains other than the website a user originally visited. Over time, websites began implementing techniques which enabled the sharing of data collected by first-party cookies with third party domains, giving them access to user activity.

8. In addition to first-party and third-party cookies, the technology has further evolved into an advanced and interconnected system of methods that are capable of tracking the behavior of users across multiple websites, devices, and sessions using tools such as pixels, device “fingerprinting,” and other real-time data exchanges.

***i. Cookies***

9. A cookie is a small text string with data created by a website’s server and transmitted to a web browser, which then stores the string on the user’s device. When the user revisits the website, the browser sends the string along with the HTTP request, allowing the tracker to recognize the user and build sophisticated profiles. These cookies can remain on the device for years, enabling long-term tracking and profiling.

10. When the same third-party tracker appears on multiple websites, it can use its cookies to build a comprehensive profile of users by merging data from various sources. This allows for detailed tracking of individuals' browsing habits, preferences, and behaviors across the internet.

11. Trackers and their associated cookies are installed and operate automatically and invisibly when users visit websites. Users are generally unaware that their data is being collected and shared with third parties or that cookies are storing information on their device, as the process occurs in the background without any visible signs.

***ii. Pixels***

12. Pixel “events” are JavaScript tracking codes that send detailed information about user actions to third-party servers, such as Facebook and Google, in real-time.

13. Common user events tracked by Pixels include page views (when a user loads a specific webpage), content views (when a user interacts with a specific piece of content on a webpage), clicks (when a user selects a specific element on a webpage), form submissions (text or

data a user inputs into a field on a webpage), and search queries (terms or phrases a user enters into a search box on a webpage).

14. Importantly, Pixel events represent a coordinated surveillance arrangement between websites and tech giants, like Facebook. A website lets Facebook watch their customers, and Facebook provides free tracking and analytics in exchange for data. Both profit from the arrangement at the expense of consumer privacy.

***iii. Device fingerprinting***

15. Device fingerprinting refers to a broad category of techniques that are used to identify a user's device across visits (also called "sessions"). It works by collecting information about a user's hardware and software attributes, such as browser type, operating system, screen resolution, installed fonts, and time zone and language settings. The combination of these attributes becomes the user's "device fingerprint."

16. When combined, the probability that two users have identical attributes and settings is very low, even if they have the same type of device or browser. This is because the technical characteristics still vary based on individual configuration and software versions, which allow trackers to accurately and uniquely identify users without relying on cookies.

17. Canvas fingerprinting is a specific type of device fingerprinting that identifies and tracks a user's device based on these unique characteristics. It works by downloading a Javascript code when a user visits a webpage and runs it in the user's browser. This initiates a process completely invisible to a user.

18. The Javascript creates an invisible HTML canvas element—like a digital drawing board—and draws texts, shapes, and emojis on the canvas using various fonts and colors. The script then reads back the exact pixel values of what it just drew and runs these pixels through a mathematical function (a "hash") that converts them into a "unique identifier." This unique identifier becomes the user's "device fingerprint."

19. The Javascript sends this fingerprint to a server, and the server uses it to recognize a user on future visits, without the use of any cookies.

20. The reason this process creates a unique identifier is because devices render graphics slightly differently based on their graphics card model, driver version, installed fonts, operating systems, screen resolution, and color calibration. These tiny variations create a unique pattern—like a fingerprint—that is remarkably stable and hard to change. This fingerprint persists even if a user clears their browser data.

***iv. IP Addresses***

21. IP addresses serve an important functional role on the internet by acting like a digital postal address that allows devices to send and receive data.

22. An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132). The first two sets of numbers indicate what network the device is on (e.g., 192.168), and the second two sets of numbers identify the specific device (e.g., 123.132).

23. Functionally, to make a website load on a user's internet browser, the browser sends an "HTTP request" to Defendant's server where the relevant website data is stored.

24. In response to the request, Defendant's server sends an HTTP response back to the browser with a set of instructions.

25. The server's instructions include how to properly display the Website—e.g., what images to load, what text should appear, or what music should play.

26. Thus, the IP address enables a device to communicate with another device, such as a computer's browser communicating with a server.

27. However, IP addresses can also be used as potential user identifiers, especially when used in combination with additional data collected from the techniques described above.

28. Through an IP address, the specific device's state, city, and zip code can be determined.

29. Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device or household Thus, knowing a user's IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."

30. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code" and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests." Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service" because "[c]ompanies can use an IP address … to personally identify individuals."

31. For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis. Or, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising." "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."

32. In addition, "IP address targeting can help businesses to improve their overall marketing strategy." "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."

33. Public IP addresses enable companies to monitor user interactions and behaviors across various websites and construct comprehensive profiles of users' browsing habits and preferences tied to their location.

34. They are especially effective in identifying and tracking specific individuals. As individuals use their devices across different locations (e.g., home, work, coffee shops, or other places), each location is assigned a distinct public IP address.

35. By tracking these patterns of movement between different IP addresses, businesses are able to build detailed profiles of individual users' daily routines and behaviors, which allows them to differentiate an individual from others who might be accessing the internet using the same public IP address (e.g., other members of the same household).

36. For instance, if an individual visits websites on their laptop using their home IP address in the morning, their work IP address during the day, and returns to their home IP address in the evening, this sequence forms a distinctive pattern that can be used to identify that individual.

37. For these reasons, Europe's General Data Protection Regulation classifies IP addresses as "personal data," since they can potentially be employed "to identify an individual."

**B. Tracking Technology on Defendant's Website**

38. Using a combination of the tracking technologies described above, Defendant actively shared user data with multiple third parties, including Google and other advertising, analytics, audience-management, retargeting, social-media, search-advertising, customer-experience, fraud-detection, and consent-management vendors, by deploying tools and scripts developed or operated by those companies that collected, transmitted, and processed information from users who accessed the Website.

39. Defendant's Website code causes visitors' browsers to communicate with third-party domains controlled by such vendors. These vendors include Google, Akamai, and other third parties identified through forensic testing of the specific Website pages visited by Plaintiff.

40. Specifically, forensic testing confirmed that the Website deployed 132 third-party trackers, including 22 cookies and 2 different canvas fingerprints. Defendant further shared data collected by these trackers with the Google advertising network.

41. On the Website homepage, Defendant deploys cookies and storage mechanisms that include unique visitor identifiers, advertising identifiers, analytics identifiers, session identifiers, consent-status identifiers, and device/browser identifiers. Those mechanisms include cookies and storage objects associated with Google Analytics, Google Tag Manager, Google Ads/DoubleClick, Akamai, and other tracking systems.

42. On Website product-listing, cellular-device, plan, store-locator, cart, checkout, account, search, support, and form pages, Defendant may deploy additional tracking technologies, including advertising identifiers, social-media advertising scripts, conversion-tracking scripts, browser-fingerprinting code, session-replay or behavioral-recording code, and keyboard-input event listeners.

43. The trackers set and read persistent identifiers, including Google Analytics identifiers, Google advertising identifiers, and other unique identifiers that permit Defendant and third parties to recognize the same browser, device, or user across sessions and, in some instances, across websites.

44. The trackers also store and read local-storage and session-storage data reflecting, among other things, a visitor's landing page, pages viewed, session count, visited-page arrays, page names, visitor identifiers, tab identifiers, configuration objects, IP-derived location data, and pixel-source maps.

***ii. Google Tracking Technology***

45. Google is one of the largest advertising companies in the country. To date, Google generates nearly 77.8% of its revenue through advertising bringing in a grand total of $305.6 billion. Google's advertising business has been extremely successful due, in large part, to Google's ability to target people at a granular level.

46. Defendant embedded Google Ads and Google DoubleClick scripts on its Website. These scripts caused users' browsers to communicate with Google-controlled domains and permitted Defendant to transmit information to Google, including device and browser characteristics, page-view events, content-view events, page URLs, referrer data, IP addresses, user-agent strings, and associated identifiers.

47. The Google Ads and Google DoubleClick scripts collect and transmit information about users' behavior across multiple websites, enabling Google to build detailed behavioral profiles for each user. These profiles are shared with advertisers within the Google Ad Manager ecosystem, allowing Google to show users particular advertisements based on their activity—a practice commonly known as "audience targeting."

48. Defendant also deploys Google Tag Manager on the Website. Google Tag Manager acts as a container through which Defendant loads, configures, and triggers analytics, advertising, conversion-tracking, and other scripts in response to Website events.

49. Through Google Tag Manager or scripts deployed through it, Defendant causes tracking events to be generated when a visitor loads a page, clicks a button, scrolls, views a product,

selects an option or filter, opens a form, searches, uses a store locator, or otherwise interacts with the Website.

50. Defendant's Website further uses Google-related code in connection with canvas fingerprinting. Canvas fingerprinting causes a visitor's browser to draw text, shapes, or graphics in an invisible canvas element, read back the rendered values, and generate a device-specific signature based on how the browser and device render those elements.

51. Defendant's Website further uses Google-related code in connection with canvas fingerprinting. Canvas fingerprinting causes a visitor's browser to draw text, shapes, or graphics in an invisible canvas element, read back the rendered values, and generate a device-specific signature based on how the browser and device render those elements.

52. The resulting canvas data may reflect device and browser characteristics such as font rendering, canvas geometry, graphics-rendering behavior, screen characteristics, and data-URL output. Such characteristics can be used, alone or in combination with other data, to distinguish or recognize a device even when ordinary cookie identifiers are unavailable or have been cleared.

53. Google-related tracking mechanisms set or read persistent identifiers that allow Google and Defendant to recognize the same browser or device across separate Website visits. When a visitor is logged into a Google account, Google may be capable of associating data received from the Website with that account or with other information maintained by Google.

54. Finally, if the user is logged into their Google account when visiting the Website, Google receives third party cookies allowing it to link the data collected by the code to the specific Google user, and derive demographic information about that user, such as age and gender.

***iv. Advertising Networks***

55. An advertising network is a system that connects advertisers with websites by collecting data about how users interact with a website and delivering relevant ads based on the user's behavior. These advertising networks use unique identifiers—such as cookies or device fingerprints—to persistently monitor users across different websites and build a highly detailed behavioral profile of each user over time.

56. Defendant embedded the code for the Google ad network described above. By embedding this code, the Website automatically transmitted extensive information about users' browsing behavior and identity to each of these third-party networks, including page views, product views, content interaction, IP addresses, and device and browser characteristics.

57. Defendant's Website also deploys advertising pixels and conversion-tracking scripts that transmit page-view events, script-loading events, visitor identifiers, browser identifiers, IP addresses, user-agent strings, referrer data, page URLs, and other event data to advertising platforms in real time or near real time.

58. Advertising networks may also collect or infer parameters indicating a visitor's likelihood of purchasing a product or service, commonly referred to as purchase-intent signals. Such signals may be derived from the particular pages or products viewed, the sequence of pages viewed, search activity, filters selected, form interactions, location searches, shopping-cart activity, and other Website conduct.

59. The data transmitted by the trackers is not limited to technical routing information. The trackers transmit information revealing the substance and meaning of Website communications, including the particular pages and products viewed, the order in which pages were viewed, the options selected, search terms or form content entered, and a visitor's expressed interest in particular telephone plans, devices, promotions, or store locations.

60. The trackers operate contemporaneously with visitors' Website communications. When a visitor loads a page, clicks a button, scrolls, views a product, selects a filter, opens a form, types into a field, performs a search, uses a store locator, or otherwise interacts with the Website, Defendant's code causes the visitor's browser to generate tracking events and transmit them to Defendant and third parties at or near the same time that the underlying communication is sent or received.

61. The interception occurs before the communication comes to rest in any ordinary sense. Defendant's code reads event objects, page data, Document Object Model information, storage identifiers, browser and device attributes, and, where applicable, user inputs while the visitor's browser is processing or transmitting the communication.

62. The third parties receiving these transmissions are not passive equipment providers used solely to store Defendant's own records. They are separate companies that receive event data and identifiers through domains they control and may combine that information with their own identifiers, advertising systems, analytics systems, account information, and cross-site or cross-service profiles.

***v. Canvas Fingerprinting***

63. Defendant implements extensive canvas fingerprinting on the Website across multiple third-party services, deploying 2 separate scripts from Google and Akamai Bot Manager.

64. Each tool captures data points on tont rendering patterns (how text appears on canvas), geometric rendering capabilities, and full canvas data extraction via data URLs - creating a highly detailed device fingerprint. Together, this creates an identifier that persists across browsing sessions

65. By integrating 2 separate fingerprinting instances across different vendors, this creates a highly unique and persistent identifier that can track users across sessions and websites.

66. Canvas fingerprinting causes the browser to render text, shapes, or graphics in an invisible canvas element and then extract information concerning the resulting output. Variations in operating systems, browsers, graphics hardware, installed fonts, rendering engines, and device configurations cause different devices to produce different outputs.

67. The canvas-fingerprinting tools deployed on the Website capture or derive data points concerning font-rendering patterns, geometric-rendering capabilities, graphics-rendering characteristics, and canvas output extracted through data URLs or comparable methods, thereby contributing to a detailed device or browser signature.

68. The use of multiple fingerprinting mechanisms across different vendors increases the amount and variety of device-level data available to Defendant and those vendors and enhances their ability to distinguish or recognize a browser or device across browsing sessions.

69. Unlike an ordinary cookie, a canvas-derived signature does not depend solely on a value stored in a conventional cookie file. A device may therefore remain distinguishable after ordinary cookies are deleted, although the persistence and reliability of any resulting identifier

depend on the particular fingerprinting implementation and the stability of the device and browser configuration.

**C. Defendant Aided and Abetted Third-Party Interception by Installing and Using Trackers on the Website to Collect Plaintiff's and Class Member's Communications Without Consent or Court Order**

70. Section 631(a) of CIPA prohibits, among other conduct, a person from willfully and without the consent of all parties to a communication, or in an unauthorized manner, reading, attempting to read, or learning the contents or meaning of a communication while the communication is in transit, passing over a wire, line, or cable, or being sent from or received at any place within California. Section 631(a) also imposes liability upon a person who aids, agrees with, employs, conspires with, permits, or causes another person to engage in the prohibited conduct. Cal. Penal Code § 631(a).

71. In the internet context, courts have recognized at the pleading stage that a software vendor may constitute an unauthorized third-party interceptor when its technology contemporaneously receives a user's communications and the vendor has the ability to use the intercepted communications for its own benefit or independent purposes. See *Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169 at *4 (N.D. Cal. Apr. 4, 2025)(rejecting the argument that the trackers were not unauthorized third parties but "extensions" of the website); *Ambriz v. Google, LLC*, 2025 WL 830450 (third party trackers who have the capability to use the information transmitted are unauthorized parties regardless of their intent).

72. Defendant owns, operates, and controls the Website, https://www.metrobyt-mobile.com, through which Defendant offers prepaid wireless services, mobile devices, internet-connected products, and related services.

73. Defendant selects and controls the Website's source code, chooses the third-party tracking vendors incorporated into the Website, embeds or authorizes the Trackers, configures the events and information the Trackers capture, determines the pages on which the Trackers operate, and receives commercial and operational benefits from the resulting collection and processing of Website-user information.

74. Plaintiff was physically located in California when he accessed and interacted with the Website and when the communications alleged herein were sent from and received within California.

75. Defendant intentionally caused the Trackers' code to be loaded and executed in Plaintiff's and Class Members' browsers when they accessed the Website. By embedding or directing the Website to call third-party code, Defendant caused that code to execute within the context of the Website and to monitor and transmit information concerning visitors' interactions with the Website.

76. Defendant's Website code caused Plaintiff's browser to send copies of Plaintiff's Website communications and associated identifiers to third-party domains at or near the same time Plaintiff communicated with the Website and before, simultaneously with, or as part of the Website's receipt and processing of those communications.

77. The intercepted communications included the contents and meaning of Plaintiff's Website activity, including his viewing of the Website homepage and pages concerning cell phones and wireless plans, and information revealing that he was shopping for a new cell phone and comparing wireless plans.

78. The Trackers and their operators read, decoded, categorized, matched, analyzed, or otherwise learned the contents and meaning of those communications by processing event names, page names, URLs, referrers, search terms, selections, user inputs, identifiers, and related information to determine what Plaintiff viewed, selected, searched, entered, communicated, or attempted to do on the Website.

79. The third-party Tracker operators were capable of retaining, combining, and using the intercepted communications and associated identifiers for their own commercial purposes, including advertising attribution, audience management, analytics, user recognition, retargeting, fraud or risk scoring, behavioral profiling, product development, and tracking users across websites, services, sessions, or devices.

80. The third-party Tracker operators were not parties to Plaintiff's intended communications with Defendant. When Plaintiff visited the Website, viewed plan or device pages,

selected options, submitted searches, entered information, or otherwise interacted with the Website, Plaintiff intended to communicate with Defendant and did not intend to communicate with the third-party Tracker operators.

81. Defendant aided, employed, permitted, and caused the third parties to intercept Plaintiff's and Class Members' communications by embedding or authorizing the third-party code, configuring the events that caused the code to operate, permitting third-party identifiers to be set or read, and causing visitors' browsers to send copies of their Website communications to third-party domains.

82. Before the challenged interceptions occurred, Defendant did not obtain Plaintiff's consent for third parties to contemporaneously read, decode, learn, copy, receive, retain, use, or disclose the contents or meaning of Plaintiff's Website communications.

83. Defendant's cookie banner and privacy controls did not procure prior consent to the challenged interceptions because the Website's tracking architecture began operating immediately upon page load, before a visitor affirmatively consented to nonessential tracking or had a meaningful opportunity to exercise a privacy choice. The Website's tracking processes automatically loaded and executed code, generated or accessed identifiers, interacted with browser storage, accessed browser and device characteristics, and initiated communications with Defendant and third-party tracking endpoints before any effective consent choice was obtained. Accordingly, Defendant's cookie banner and privacy controls could not provide prior consent for the challenged interceptions, disclosures, or uses of Plaintiff's and Class Members' Website communications and data.

84. Even before a visitor provides any affirmative consent, Defendant's Website deploys tracking mechanisms that do not depend exclusively on conventional browser cookies, including canvas fingerprinting, local storage, session storage, device or browser fingerprinting, session-recording technology, keyboard-input event capture, Facebook Pixel events, and event-based tracking. On the homepage at https://www.metrobyt-mobile.com/, Defendant's Website executes 33 third-party tracking requests, deploys 22 cookies, uses 2 canvas-fingerprinting instances, stores 7 local-storage items, and stores 13 session-storage items. Defendant's Website

also collects or transmits IP-address data, unique identifiers, User-Agent and browser data, and device and browser rendering characteristics through canvas font rendering, canvas geometry, and data-URL extraction.

85. On the Website's cell-phone page at https://www.metrobyt-mobile.com/cell-phones, Defendant's Website executes 93 third-party tracking requests, deploys 35 cookies, uses 16 canvas-fingerprinting instances, stores 20 local-storage items, stores 25 session-storage items, executes 2 Facebook Pixel events, uses a Microsoft Clarity session-recording implementation, and uses a keyboard-input event-capture implementation. The canvas-fingerprinting systems deployed on that page include Google Tag Manager, Facebook SDK, Qualtrics, ThreatMetrix, Shape Security, and Akamai Bot Manager, which capture canvas font rendering, canvas geometry, and data-URL extraction. The Facebook Pixel events transmit PageView and script-loading data, including the page URL, timestamp, User-Agent data, IP address, referrer, browser fingerprints, device characteristics, browser capabilities, network information, and advanced-matching parameters

86. Before the challenged collection occurred, Defendant's consent interface did not disclose clearly and conspicuously that third parties would contemporaneously receive copies of Plaintiff's Website communications; that canvas or other fingerprinting would be used to generate or derive persistent device identifiers; that session-recording or keyboard-input capture would occur on the pages Plaintiff visited; or that Plaintiff's Website communications and identifiers would be used for cross-site advertising, profiling, user recognition, or other independent third-party purposes.

87. Separate and apart from the interception of communication contents alleged under Section 631(a), Defendant installed or used, or caused to be installed or used, processes that recorded or decoded non-content dialing, routing, addressing, or signaling information transmitted by Plaintiff's and Class Members' browsers, including IP addresses, IP-derived geolocation and ISP/network information, destination domains, destination URLs and endpoints, request paths, request types, request timestamps, page URLs, referrer URLs, User-Agent strings, browser and browser-version information, operating-system information, screen-resolution data, cookie identifiers, advertising identifiers, analytics identifiers, session identifiers, visitor identifiers, local-

storage identifiers, session-storage identifiers, device or browser identifiers generated through canvas font rendering, canvas geometry, and data-URL extraction, Google Analytics identifiers, Adobe visitor identifiers, Microsoft/Bing identifiers, Facebook browser identifiers, Snapchat identifiers, and other comparable routing, addressing, and signaling information.

88. Defendant did not obtain a court order authorizing the installation or use of the processes alleged in the preceding paragraph, and none of the statutory exceptions set forth in California Penal Code Section 638.51(b) applied.

89. Accordingly, Defendant aided, employed, permitted, and caused unauthorized third parties to contemporaneously intercept and learn the contents and meaning of Plaintiff's and Class Members' communications in violation of California Penal Code Section 631(a). Separately, Defendant installed or used, or caused the installation or use of, the alleged pen-register or trap-and-trace processes without judicial authorization or an applicable statutory exception, in violation of California Penal Code Section 638.51.

90. Under the ECPA, consent by one party does not authorize an interception where the communication is intercepted for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or any state. 18 U.S.C. § 2511(2)(d); see also *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1077 (N.D. Cal. 2023).

91. Defendant's alleged purpose extended beyond the act of interception itself. Defendant caused the communications to be intercepted so that Defendant and the third parties could associate Plaintiff's Website activity with persistent identifiers, disclose or combine Plaintiff's communications with existing profiles, recognize Plaintiff across sessions or services, perform behavioral profiling, and use the resulting information for targeted advertising and other commercial purposes without authorization and contrary to Defendant's representations concerning privacy and tracking. These independent intended uses are alleged to violate CIPA, California's Comprehensive Computer Data Access and Fraud Act, and Plaintiff's right to privacy under the California Constitution. Accordingly, consent by Defendant alone does not shield the challenged interception under the ECPA's party-consent exception. See *Smith v. Rack Room Shoes, Inc.*, *supra,* 2025 WL 1085169 at *5 (the website tracking allegations are analogous to the purpose of engaging

in a HIPPA violation, which courts consistently find constitutes an independent prohibited purpose.”).

**D. Defendant’s Conduct Constitutes an Unauthorized Interception of the Contents of Communications under CIPA and the ECPA**

92. Because the Trackers intercept information about the Website visitors’ interactions with the Website, Defendant’s use of the Trackers constitutes an unlawful interception and disclosure of an “electronic communication” under Section 2511 of the ECPA.

93. Defendant’s use of the Trackers also constitutes an “unauthorized connection” which “reads, or attempts to read, or to learn the contents or meaning of [a] message, report, or communication” under Section 631 of CIPA.

94. Defendant’s use of the Trackers constitutes interception of electronic communications under CIPA and the ECPA because the Trackers acquire Plaintiff’s Website communications while those communications are being sent, received, routed, processed, or otherwise transmitted.

95. The intercepted communications include contents because they reveal the substance, purport, and meaning of Plaintiff’s communications with the Website, including what Plaintiff sought to view, compare, select, search, type, locate, or purchase.

96. The contents intercepted from Plaintiff included his viewing of the Website homepage and pages concerning cell phones and wireless plans, together with information revealing that he was shopping for a new cell phone and comparing wireless plans.

97. The intercepted contents are not limited to IP addresses or technical routing data. The data discloses Plaintiff’s personal interest in particular wireless products or services, the sequence and duration of Plaintiff’s Website activity, Plaintiff’s location-related interactions, Plaintiff’s device or browser identity, and Plaintiff’s expressed shopping intent.

98. Defendant and the third-party Trackers acquired these contents through electronic devices and processes, including JavaScript, pixels, tags, cookies, local storage, session storage, event listeners, browser APIs, tag managers, and server endpoints.

99. The interceptions occurred in transit because Defendant's code caused the contents and related identifiers to be copied, read, decoded, and transmitted to third parties as Plaintiff's browser loaded Website pages and as Plaintiff interacted with those pages.

100. "Contents" of a communication refer to "any information concerning the substance, purport, or meaning of a communication." *In re Zynga Priv. Litig*. (9th Cir. 2014)750 F.3d 1098, 1106–07)(internal quotations omitted). This includes button clicks, viewing history, cart history, or any other information that reveals a user's personal interests, queries, or habits. See *Yoon v. Meta Platforms, Inc*. (N.D. Cal. Dec. 30, 2024) 2024 WL 5264041, at *5).

101. The communications intercepted by the Trackers are "contents" within the meaning of CIPA and the ECPA because they reveal substantive information about the user's interests, preferences, and potential consumer behavior.

**E. Defendant's Conduct Constitutes an Illegal Pen Register and Trap and Trace Device Under CIPA**

102. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

103. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

104. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

105. In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

106. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices"

to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

107. For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address(es) the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is incoming information that is being sent to that same user.

108. Defendant executes each of the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect information that identifies the outgoing "routing, addressing, or signaling information" of the user by through the collection of IP addresses through the 38 third-party trackers, as well as the device fingerprinting techniques and unique identifiers described above. Accordingly, the Trackers are each "pen registers."

109. The Trackers are "processes" because they are software-based mechanisms that identify visitors, cause communications to be transmitted, record or decode routing, addressing, and signaling information, and correlate that information with persistent identifiers.

110. The Trackers are "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley, supra*, 2023 WL 4833466, at *15.

111. The Trackers are also "devices" because they operate on Plaintiff's and Class Members' computers, smartphones, browsers, and computer systems, as well as on Defendant's and third parties' servers.

112. The Trackers are a "device" because "in order for software to work it must be ran on some kind of computing device." *James v. Walt Disney Co*., 701 F.Supp.3d 942 (N.D. Cal. Nov. 8, 2023).

113. Defendant executes each of the Trackers on users' browsers for marketing and analytics purposes. The Trackers collect information that identifies the outgoing routing, addressing, or signaling information of users through the collection of IP addresses by the 38 third-party trackers, as well as through the device-fingerprinting techniques and unique identifiers described above.

114. The Trackers record or decode non-content routing, addressing, and signaling information, including IP addresses, URLs, referrer URLs, hostnames, device identifiers, browser identifiers, cookie identifiers, advertising identifiers, session identifiers, timestamps, user-agent strings, browser characteristics, operating-system characteristics, screen characteristics, and location-related data.

115. The Trackers capture incoming electronic impulses and associated addressing and signaling information that identify the source of Website communications, including Plaintiff's IP address, device and browser characteristics, persistent identifiers, and location-related data.

116. Because the Trackers capture outgoing information that capture the source of a communication, they are a "pen register" for the purposes of CIPA section 638.50(b).

117. Because the Trackers capture incoming electronic impulses and associated routing, addressing, and signaling information reasonably likely to identify the source of electronic communications, they also constitute trap and trace devices for purposes of CIPA section 638.50(c).

118. Plaintiff's pen-register and trap-and-trace claim is directed to the Trackers' capture of routing, addressing, and signaling information. Plaintiff's separate claim under CIPA section 631 is directed to the Trackers' interception of the contents and meaning of Website communications.

119. Defendant installed and used the Trackers on Plaintiff's browser and device when Plaintiff visited the Website from California on multiple occasions, including a recent visit and another visit a few months earlier.

120. Defendant installed and used the Trackers without first obtaining a court order.

121. Plaintiff suffered injury from Defendant's installation and use of the Trackers because Defendant caused Plaintiff's persistent identifiers, device and browser characteristics, IP address, location-related data, Website-visit data, and other identifying data to be recorded, decoded, correlated, and disclosed without lawful consent.

122. Plaintiff lost control over that data and was deprived of the ability to prevent Defendant and third parties from using it to identify, track, profile, and retarget him. Plaintiff also later spent time and effort clearing his browsing history or cache after browsing the Website.

**F. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

123. The collection of Plaintiff's and Class Members' personally identifying, nonanonymized identifying information, and Website activity through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

124. As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

125. Defendant's collection, interception, use, and disclosure of Plaintiff's and Class Members' Website communications, persistent identifiers, device fingerprints, location-related data, browsing activity, page-view activity, search or form inputs, and shopping-intent signals constitutes an invasion of privacy.

126. The invasion is serious because Defendant did not merely collect routine server logs. Defendant embedded code that caused Plaintiff's browser and device to generate persistent identifiers, disclose Website communications to third parties, transmit data to advertising and analytics ecosystems, and enable tracking across sessions and across websites.

127. The invasion is highly offensive because it occurred invisibly; it occurred before any meaningful consent; it occurred despite Plaintiff's privacy expectations and his practice of rejecting cookies because he is concerned about his privacy; it involved third-party advertising and profiling companies; it used persistent identifiers that are difficult for users to delete or avoid; and it disclosed the meaning of Plaintiff's Website communications concerning his shopping for a new cell phone and comparing wireless plans.

## III. PLAINTIFF'S AND THE CLASS MEMBERS' EXPERIENCES

128. Plaintiff Spencer Kaidi visited the Website on multiple occasions, including in January 2026 and several months earlier. Plaintiff visited the Website while shopping for a new cell phone and comparing wireless plans.

129. Plaintiff was physically located in California when he made the Website visits alleged herein.

130. Plaintiff visited the Website to shop for and compare phone plans, mobile devices, promotions, and related wireless services for personal or household purposes.

131. Plaintiff used the Chrome browser to access the Website. Plaintiff accessed the Website using a desktop computer running Windows and a smartphone running Android.

132. Plaintiff accessed the Website through a Wi-Fi connection. Plaintiff was not using a VPN, ad blocker, or incognito or private-browsing mode. Plaintiff's browser settings allowed cookies.

133. Plaintiff was logged into a Google browser while browsing the Website.

134. Plaintiff viewed the Website homepage at https://www.metrobyt-mobile.com/. Plaintiff also viewed pages on the Website concerning cell phones and wireless plans.

135. Plaintiff interacted with the Website by browsing pages concerning cell phones and wireless plans while shopping for a new cell phone and comparing wireless plans.

136. Plaintiff's Website communications included the contents and meaning of his interest in a new cell phone and wireless plans. Those communications revealed Plaintiff's shopping intent and his personal interest in purchasing or comparing wireless products and services.

137. Each of the Trackers described above are found on the Website. Therefore, when Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browsers.

138. While Plaintiff interacted with the Website, Defendant's code caused Plaintiff's browser to transmit Plaintiff's Website communications and associated data to Defendant and third-party domains in real time, including page URLs, page titles, referrer information, timestamps, IP address, browser type, device type, operating system information, cookie and session identifiers, and data reflecting the pages he viewed and that he was shopping for a new cell phone and comparing wireless plans.

139. The Trackers generated or used persistent identifiers associated with Plaintiff's browsers and devices, including cookie identifiers, analytics identifiers, advertising identifiers, session identifiers, local-storage identifiers, and browser or device identifiers generated or derived through fingerprinting and related tracking mechanisms.

140. Defendant used the information collected by the Trackers and shared it with third parties to analyze Website data and marketing campaigns, conduct targeted advertising based on Plaintiff's locations, and ultimately boost Defendant's and advertisers' revenue.

141. Plaintiff did not consent to Defendant installing or using the Trackers to intercept, read, decode, disclose, transmit, or use Plaintiff's Website communications, device identifiers, browser identifiers, persistent identifiers, location-related data, search or form inputs, or Website activity.

142. Plaintiff did not consent to third parties receiving, reading, decoding, using, or disclosing Plaintiff's Website communications or identifiers for advertising, analytics, audience creation, retargeting, cross-site tracking, session recording, keyboard-input capture, or device fingerprinting.

143. Plaintiff did not create an account on the Website. Plaintiff did not purchase anything on the Website. Plaintiff did not intend to communicate with any third-party advertising, analytics, social-media, session-recording, or identity-resolution company when he visited the Website.

144. Defendant did not obtain a court order before installing or using the Trackers on Plaintiff's browsers and devices.

145. Plaintiff later cleared his browsing history or cache after browsing the Website.

146. Plaintiff suffered injury from Defendant's conduct, including loss of control over his Website communications and data, invasion of privacy, disclosure of data to third parties, creation or use of persistent identifiers, unwanted tracking, and the time and effort he later spent clearing his browsing history or cache.

147. Plaintiff's personal data, browser storage, device resources, and communications have economic value. Defendant and third parties used Plaintiff's data and communications to generate analytics, advertising, audience, attribution, retargeting, personalization, and profiling value without compensating Plaintiff.

148. Although Defendant uses at least several different Trackers on the Website, they all operate in the same manner and perform the same function, i.e., collecting Plaintiff's and Class

Members' identifying information and Website activity. Thus, at any given time a user visits the Website, Defendant will cause one of the Trackers to be installed on users' browsers for the purpose of collecting IP addresses and other user behavior data associated with the Plaintiff and Class Members.

149. Plaintiff and Class Members did not provide prior consent for Defendant to install or use the Trackers on their browsers or devices or to cause the Trackers to intercept, collect, record, decode, correlate, transmit, use, or disclose their Website communications and identifying data.

150. Defendant did not obtain a court order before installing or using the Trackers on Plaintiff's and Class Members' browsers and devices.

151. Class Members experienced the same or substantially similar conduct because Defendant deployed the same Trackers, tracking code, third-party scripts, cookies, local storage, session storage, pixels, and browser-fingerprinting processes across the Website during the Class Period.

152. Thus, like Plaintiffs, Class Members have also had their privacy invaded by Defendant's violations of CIPA sections 631 and 638.51(a).

153. Plaintiff wishes to return to the Website to compare phone plans, devices, promotions, store locations, and related services, but Plaintiff is deterred from doing so because Defendant continues to deploy the challenged Trackers without prior, meaningful consent.

154. Plaintiff seeks to access the Website without third-party tracking technologies intercepting and disclosing his communications or personal data, or, alternatively, to be provided with a meaningful choice regarding what data is collected.

## CLASS ACTION ALLEGATIONS

155. Class Representative Plaintiff brings this action on their own behalf and on behalf of all other persons similarly situated. The putative class that Class Representative Plaintiffs seek to represent is composed of:

**Nationwide Class**

All United States residents who accessed the Website and had their identifying information and website behavior data collected by the Trackers without consent

and/or despite declining consent two years prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Class").

**California subclass**

All California residents who accessed the Website in California and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent one year prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Subclass").

156. Excluded from the Class are the natural persons who are directors, and officers, of the Defendant, as well as judicial officers and attorneys of record, their families, and their staff who are assigned to this action. Class Representative Plaintiff expressly disclaims that they are seeking a class-wide recovery for personal injuries attributable to Defendant's conduct.

157. Plaintiff is informed and believe that the members of the Class are so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Class Representative Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant.

158. There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Class Representative Plaintiff's claims are typical of the members of the class, and Class Representative Plaintiff can fairly and adequately represent the interests of the Class.

159. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the Defendant unlawfully read and/or intercepted communications by Plaintiff and members of the Class through use of the Trackers;

(b) Whether the Defendant unlawfully collected routing, addressing, and signaling information from Plaintiff and members of the Class through use of the Trackers;

(c) Whether Defendant violated CIPA section 631(a);

(d) Whether Defendant violated CIPA section 638.51(a);

(e) Whether Defendant violated the Wiretap Act, 28 U.S.C. section 2510 et seq.;

(f) Whether the Trackers are "pen registers" pursuant to Cal. Penal Code section 638.50(b);

(g) Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(h) Whether Defendant sought or obtained a court order for its use of the Trackers; and

(i) Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

Class Representative Plaintiff's claims are typical of those of the other Class members because Class Representative Plaintiffs, like every other Class member, were exposed to virtually identical conduct and are entitled to the same relief under the CIPA.

160. Class Representative Plaintiff will fairly and adequately protect the interests of the Class. Moreover, Class Representative Plaintiff has no interest that is contrary to or in conflict with those of the Class they seek to represent during the Class Period. In addition, Class Representative Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and intend to prosecute this action vigorously.

161. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendant in the State of California and would lead to repetitious trials of the numerous common questions of fact and law in the State of California. Class Representative Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

162. Proper and sufficient notice of this action may be provided to the Class members through direct mail.

163. Moreover, the Class members' individual damages are insufficient to justify the cost of litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Absent certification of this action as a class action, Class Representative Plaintiff and the members of the Class will continue to be damaged by the practices of Defendant.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of the California Invasion of Privacy Act,**

**Cal. Penal Code § 630, et seq.(a)**

**(California subclass only)**

164. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

165. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

166. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

167. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

168. Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent

of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

169. Plaintiff and California Subclass members sent and received electronic communications with the Website while physically located in California.

170. Defendant used tracking software on the Website to intercept and collect information concerning Website visitors' behavior, communications, and activity on the Website.

171. Defendant intentionally caused the Trackers to be installed, downloaded, executed, and used in Plaintiff's and California Subclass members' browsers when they accessed the Website.

172. Defendant's Trackers read, attempted to read, decoded, acquired, copied, learned, or disclosed the contents and meaning of Plaintiff's and California Subclass members' Website communications while those communications were in transit or being sent from or received in California.

173. The contents and meaning intercepted by the Trackers included the pages viewed, products or plans viewed, buttons clicked, search or form information entered, location-related queries, shopping intent, Website-navigation sequence, and other information revealing the substance and meaning of Website communications.

174. Plaintiff's intercepted contents included his viewing of the Website homepage and pages concerning cell phones and wireless plans, and information revealing his shopping for a new cell phone and comparing wireless plans.

175. Defendant aided, employed, permitted, and caused third parties to intercept Plaintiff's and California Subclass members' communications by embedding third-party code, configuring tracking events, permitting third-party identifiers to be created, set, or read, and causing visitors' browsers to transmit copies of their Website communications to third-party domains.

176. The third parties were not parties to Plaintiff's intended communications with Defendant. Plaintiff did not intend to communicate with those third parties and did not consent to those third parties reading, decoding, receiving, retaining, using, or disclosing his Website communications.

177. Defendant did not obtain prior consent from Plaintiff or California Subclass members for the challenged interceptions, disclosures, or uses.

178. Defendant's cookie banner, privacy links, or general privacy disclosures did not obtain prior all-party consent to the challenged conduct. Plaintiff did not provide prior consent to the challenged conduct, and Plaintiff's practice when presented with cookie choices is to reject them because he is concerned about his privacy. In any event, the challenged tracking occurred before any effective consent choice could be obtained.

179. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

180. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

181. The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

182. The Trackers are devices or processes that record, decode, or capture routing, addressing, and signaling information, including IP addresses, URLs, referrer URLs, hostnames, user-agent strings, device identifiers, browser identifiers, cookie identifiers, advertising identifiers, session identifiers, timestamps, location-related data, and device and browser characteristics.

183. The Trackers constitute pen registers because they are devices or processes that record or decode routing, addressing, or signaling information transmitted by Plaintiff's and California Subclass members' computers, smartphones, browsers, and other electronic-

communication facilities.

184. The Trackers also constitute trap and trace devices because they capture incoming electronic impulses and associated routing, addressing, or signaling information reasonably likely to identify the source of Plaintiff's and California Subclass members' electronic communications.

185. At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers and used the Trackers to collect identifying information of Plaintiff and Class Members, including IP addresses.

186. Defendant installed and used the Trackers on Plaintiff's and California Subclass members' browsers, devices, and computer systems without first obtaining a court order.

187. Plaintiff and California Subclass members were injured by Defendant's violations because Defendant caused their private Website communications, persistent identifiers, device and browser characteristics, IP addresses, location-related data, and Website activity to be intercepted, disclosed, recorded, decoded, correlated, and used without lawful consent or court authorization.

188. Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

189. Defendant did not obtain a court order to install or use the Trackers.

190. Pursuant to Cal. Penal Code section 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA section 631(a) and 638.51(a), and each seeks injunction and statutory damages of $5,000 for each of Defendant's violations of CIPA section 631(a) and 638.51(a).

## SECOND CAUSE OF ACTION

### Violation of the Wiretap Act

### Title 1 of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2510, *et seq.*)

191. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

192. The Wiretap Act prohibits the intentional interception, use, and/or disclosure of the contents of any wire, oral, or electronic communication. 18 U.S.C. § 2511(a), (c), (d).

193. "Intercept" is defined as "the aural or other acquisition of the contents of any wire,

electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4).

194. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

195. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

196. Plaintiff is an individual and is therefore a "person" for purposes of § 2510(6).

197. Defendant is a corporation and is therefore a "person" for purposes of § 2510(6).

198. Plaintiff and Class Members sent and received electronic communications when they accessed and interacted with the Website.

199. Defendant intentionally intercepted, endeavored to intercept, and procured third parties to intercept Plaintiff's and Class Members' electronic communications by embedding, configuring, and deploying the Trackers on the Website.

200. The Trackers acquired the contents of Plaintiff's and Class Members' electronic communications through electronic, mechanical, or other devices, including browser-executed scripts, pixels, tags, event listeners, cookies, storage mechanisms, application programming interfaces, and server endpoints.

201. The contents acquired included information concerning the substance, purport, and meaning of Plaintiff's and Class Members' Website communications, including Plaintiff's viewing of the Website homepage and pages concerning cell phones and wireless plans, and information revealing that he was shopping for a new cell phone and comparing wireless plans, and similar communications of Class Members.

202. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(a) when it installed Trackers on Plaintiff's browsers, which then intercepted and collected Plaintiff's identifying information, as well as dozens of other data points that revealed Plaintiff's and Class Members' behavior and activity on the Website without their consent.

203. Defendant disclosed the contents of Plaintiff's and Class Members' electronic communications to third parties by causing their browsers to transmit copies of those communications and associated identifiers to third-party domains.

204. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(c) when it disclosed Plaintiff's and Class Members' identifying information, behavior, and activity, obtained from the Trackers to third parties without their consent.

205. Defendant used the contents of Plaintiff's and Class Members' electronic communications for advertising, analytics, audience creation, retargeting, conversion measurement, personalization, profiling, and revenue-generating purposes.

206. When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(d) when it used Plaintiff's identifying information, behavior, and activity obtained from the Trackers for its own advertising and marketing purposes without their consent.

207. Plaintiff did not consent to Defendant's interception, use, or disclosure of the contents of his electronic communications. Plaintiff likewise did not consent to any third party's interception, use, or disclosure of those contents.

208. To the extent Defendant contends that it consented to the interception of communications to which it was a party, the one-party consent exception does not apply because Defendant procured the interception for the purpose of committing independently wrongful acts, including violations of CIPA, the California Comprehensive Computer Data Access and Fraud Act, and the right to privacy under the California Constitution, and for the purpose of facilitating the unauthorized disclosure and commercial exploitation of Plaintiff's and Class Members' communications by third-party advertising and analytics systems.

209. The independently wrongful purpose was not incidental. Defendant's primary and determining purpose in deploying the challenged Trackers was to obtain, disclose, use, monetize, profile, and exploit Website communications and associated identifiers without lawful consent, including by enabling third-party advertising and analytics platforms to receive and process those communications for cross-site tracking, audience creation, attribution, retargeting, and profiling.

210. As a result of Defendant's violations of the Wiretap Act, Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights, loss of their information and loss of money and costs incurred, all of which have ascertainable value to be proven at trial.

211. Pursuant to 18 U.S.C. § 2520, Plaintiff has been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are each entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred.

## THIRD CAUSE OF ACTION

**Violation of the California Computer Data Access and Fraud Act**

**(California Penal Code § 502)**

**(California subclass only)**

212. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

213. The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

214. The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

215. For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer

system, or computer network." Cal. Penal Code § 502(b)(1).

216. The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

217. The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

218. Plaintiff's and Class members' web browsers used to access the Website are "computer software," and the computers on which Plaintiff and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

219. The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

220. As discussed above, a website cookie, including a third-party tracker cookie, and an IP address are both "data" within the meaning of the statute.

221. Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

222. The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

223. The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer

programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

224. Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

225. Defendant knowingly accessed Plaintiff's and California Subclass members' computers, computer systems, computer networks, browsers, and data by causing the Trackers to download, execute, read, write, store, retrieve, process, transmit, and disclose data on or from those systems.

226. Defendant's permission to cause Plaintiff's browser to load the Website was limited to code reasonably necessary to provide the pages and functions Plaintiff requested. Plaintiff did not give Defendant permission to install or use Trackers for third-party advertising, cross-site profiling, session recording, keyboard-input capture, canvas fingerprinting, persistent identification, or disclosure of Website communications to third parties.

227. Defendant also exceeded Plaintiff's permission by using first-party Website code to cause third-party scripts to execute in Plaintiff's browser and communicate with third-party domains, thereby providing third parties with a means of accessing Plaintiff's computer system, browser, and data.

228. Defendant knowingly and without permission took, copied, and made use of Plaintiff's and California Subclass members' data, including Website communications, page views, click events, persistent identifiers, device and browser characteristics, IP addresses, location-related data, search or form inputs, and other Website activity.

229. Defendant knowingly and without permission added and altered data, computer software, and computer programs on Plaintiff's and California Subclass members' computers and browsers by setting cookies, writing local-storage and session-storage objects, creating persistent identifiers, executing tracking scripts, and accessing browser application programming interfaces for fingerprinting and event capture.

230. Defendant knowingly and without permission provided or assisted in providing third parties with a means of accessing Plaintiff's and California Subclass members' computers, computer systems, computer networks, browsers, and data by embedding third-party Trackers and causing Plaintiff's and California Subclass members' browsers to transmit data to third-party domains.

231. Based on Defendant's unauthorized installation and storage of third-party tracking technology on Plaintiff's and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiff's and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

232. Defendant violated California Penal Code section 502(c)(2) by knowingly and without permission taking, copying, and making use of Plaintiff's and California Subclass members' data, including Website communications, IP addresses, persistent identifiers, device and browser characteristics, location-related data, and Website activity. Defendant violated California Penal Code section 502(c)(4) by knowingly and without permission adding or altering data, computer software, and computer programs on Plaintiff's and California Subclass members' computers, browsers, and computer systems.

233. Defendant violated California Penal Code sections 502(c)(6) and 502(c)(7) by knowingly and without permission providing or assisting in providing third-party Trackers with a means of accessing, and by accessing or causing to be accessed, Plaintiff's and California Subclass members' computers, computer systems, computer networks, browsers, and data.

234. Plaintiff and California Subclass members are citizens of California and used their computers, computer systems, computer networks, browsers, and devices in California. Defendant accessed or caused to be accessed Plaintiff's and California Subclass members' data and other identifying information from within California.

235. Plaintiff and California Subclass members suffered damage and loss within the meaning of CDAFA, including consumption of device resources, browser storage, processing resources, bandwidth, and data; loss of the economic value of their data; loss of control over their data; time spent clearing browser history, cookies, cache, or storage; time spent changing privacy

settings; costs or time spent mitigating tracking; and, as to Plaintiff, the time and effort he later spent clearing his browsing history or cache after browsing the Website.

236. Plaintiff personally suffered damage and loss, including the use of his browser storage and other device resources by the Trackers and the time and effort he later spent clearing his browsing history or cache after browsing the Website.

237. Defendant was unjustly enriched by accessing, acquiring, taking, copying, using, and disclosing Plaintiff's and California Subclass members' data and computer resources without permission for analytics, advertising, personalization, audience creation, retargeting, profiling, and other revenue-generating purposes.

238. Defendant used Plaintiff's and California Subclass members' data and computer resources to increase the value and effectiveness of its advertising, analytics, marketing, personalization, attribution, and retargeting activities and received financial and commercial benefits without compensating Plaintiff or California Subclass members.

239. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members have suffered damages. Under Penal Code § 502(e)(1), Plaintiff and Class members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial.

240. Plaintiff and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

## <u>FOURTH CAUSE OF ACTION</u>

**Invasion of Privacy**

**(Violation of Art. 1, § 1, California Constitution)**

**(California subclass only)**

241. The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

242. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying

and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

243. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

244. Plaintiff and Class members have a legally protected privacy interest in their personally identifying information and addressing information that are captured, without notice or consent, when they access and view the Website. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

245. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiff and Class members were not aware of and could not have reasonably expected that Defendant would use website tracking technology and install third-party tracker cookies without notice or obtaining consent. Those unauthorized Trackers collected and transmitted to undisclosed third parties Plaintiff's and Class members' communications and personally identifying and addressing information, including their IP addresses, which contain geolocation data.

246. Defendant's unauthorized (1) installation of the Trackers and (2) collection and disclosure to third parties of Plaintiff's and Class members' communications and personally identifying and addressing information, all without consent or adequate notification to Plaintiff and Class members, are an invasion of Plaintiff's and Class members' privacy.

247. Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose those communications and personally identifying and addressing information, including

IP addresses, to any third-party tracker embedded in the Website, and the Trackers did not have authorization to collect and use that information; and (iii) the invasion deprived Plaintiff and Class members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

248. As a direct and proximate result of Defendant's actions, Plaintiff and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

249. Plaintiff and the Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant as a result of or in connection with the intrusions upon Plaintiff's and Class members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiff and Class members properly for the harm to their privacy interests.

250. Plaintiff also seeks such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**

**(Violations of the CALIFORNIA UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §17200, *et seq.*)**

251. Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

252. Violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices that constitute "unfair competition" as defined in the UCL, including, but not limited to, the following:

a. by violating the provisions of the CIPA prohibiting unauthorized wiretapping, Cal. Pen. Code § 631, *et. seq*.;

b. by violating the provisions of the ECPA prohibiting unauthorized wiretapping, 18 U.S.C 2510, *et. seq*.;

c. by violating the provisions of the CIPA prohibiting unauthorized trap and trace, Cal. Pen. Code § 638.51;

d. by violating the CDAFA, Cal. Pen. Code § 502, *et. seq.;*

253. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous,

unconscionable, and/or substantially injurious to Plaintiff. Defendant's practice was also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities do not share, collect, or transmit data without consumer consent, as reflected by laws like the CIPA, Cal. Penal Code §§ 631 & 632, the CDAFA, Cal. Penal Code § 502, *et seq*.; the California Trap and Trace Law, Cal. Penal Code § 638.51; and the ECPA, 18 U.S.C. § 2510, *et. seq*.

254. As a direct and proximate result of Defendant's unfair and unlawful practices and acts, Plaintiffs were injured and lost money or property, including but not limited to the loss of their legally protected interest in the privacy of their personal information, data, and communications. In addition, Defendant treated the personal information, data, and communications of Plaintiffs as its own property, and sold and/or otherwise used it for profit, causing a loss of money and property to Plaintiffs.

255. Defendant knew or should have known that its sale of information to unauthorized third parties would violate the CIPA, ECPA, and CDAFA. Defendant's actions in engaging in the above-named unfair practice and deceptive acts were intentional, knowing, and willful, and/or wanton and reckless with respect to the rights of the Plaintiffs.

256. Plaintiffs seek relief under the UCL, including declaratory relief, attorney fees, costs and expenses (pursuant to Cal. Code Civ. P. § 1021.5), and injunctive or other equitable relief.

## DEMAND FOR JURY TRIAL

257. Plaintiff and the Class hereby demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

1. For an order certifying the Class, naming Plaintiff as the representatives of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;
2. For an order declaring that Defendant's conduct violates the statutes referenced herein;
3. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;
4. For statutory damages of $5,000 for each violation of CIPA section 631 and 638.51(a);

5. For statutory damages of $10,000 for each violation of the Federal Wiretap Act;
6. For pre- and post-judgment interest on all amounts awarded;
7. For an order of restitution and all other forms of equitable monetary relief; and
8. For an order providing injunctive and other equitable relief as necessary to protect the Plaintiff's interests as requested herein, including, but not limited to:
    a. Ordering that Defendant immediately cease and desist the unauthorized interception, transfer, release, sale, and disclosure of Plaintiffs' data;
    b. Ordering that Defendant remove, block, disable, control, update, manage, and audit any code, software, hardware, operations, systems, policy, procedure, protocols, and processes that allow all unauthorized third parties to intercept, access, copy, collect, take, open, view, monitor, mine, analyze, store, sell, gain, exchange, or otherwise use Plaintiffs' data;
    c. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner data not necessary for its provision of services.
9. For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

Dated: July 10, 2026

**POTTER HANDY LLP**

By: /s/ James M. Treglio
James M. Treglio, Esq.
Mark Potter, Esq.
Isabel Rose Masanque, Esq.
Attorneys for Plaintiffs